**SELECT MILK PRODUCERS, INC., et al., Plaintiffs,**

v.

**Ann M. VENEMAN, Secretary United States Department of Agriculture Defendant.**

**No. CIV.A. 01–60(RCL).**

United States District Court, District of Columbia.

Feb. 23, 2004.

Donald Michael Barnes, Porter, Wright, Morris & Arthur, Washington, DC, for Plaintiff.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court on plaintiffs' application for fees, expenses, and costs incurred in their prosecution of this action. Plaintiffs file for this award pursuant to 28 U.S.C. § 2412(a) and (d), the Equal Access to Justice Act, ("EAJA"). Upon consideration of plaintiffs' motion, the opposition thereto, the reply brief, and the applicable law: the Court shall grant plaintiffs' application for an award under the EAJA. The Court shall awards plaintiffs' fees, expenses, and costs in the amount of $101,266.83 to be paid by the United States Department of Agriculture.

## BACKGROUND

The Federal Milk Marketing Orders ("FMMO") is a highly complex regulatory scheme governing the prices for milk and its component parts. The Agriculture Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., ("AMAA") governs the process of amending the FMMO, among other things. In order to amend the FMMO the Secretary of Agriculture "shall give due notice of and an opportunity for a hearing upon a proposed order." 7 U.S.C. § 608c(3) (2003). The Secretary has established regulations for holding these hearings. 7 C.F.R. §§ 900.1–900.18 (2004). The regulations require that first a "Notice of Hearing" be issued that "shall define the scope of the hearings as specifically as may be practicable." 7 C.F.R. § 900.4(a). Further, the scope of the hearing is delineated by the specific proposals noticed for hearing and the Secretary identifies the sections of the FMMO that are subject to change in the rulemaking process. An Administrative Law Judge (ALJ) presides at the hearing and, as one of his duties, insures that the hearing is limited to the scope as defined in the Notice of Hearing. 7 C.F.R. § 900.6(b). At this point evidence is submitted on the matters in the notice of hearing, 7 C.F.R. § 900.8(c)(2), and witnesses testify under oath, 7 C.F.R. § 900.8(d)(1). At the close of the evidence parties may file written arguments, 7 C.F.R. § 900.9(b), the ALJ certifies the hearing transcript, 7 C.F.R. § 900.10, and thereafter the Secretary issues a recommended decision, 7 C.F.R. § 900.12.

The amendments at issue in this case resulted from a congressionally mandated formal rulemaking process. *See* H.R. 3428, as part of Consolidated Appropriations Act, 2000, Pub.L. 106–113, Div. B, § 1000(a)(8) [§ 2], Nov. 29, 1999, 113 Stat. 1536, 1501A–518 ("2000 Act"). The 2000 Act ordered the Secretary to conduct emergency rulemaking, issue amended regulations by December 1, 2000, and implement the resulting formulas on January 1, 2001. 2000 Act Sec.2(c). In April 2000, after requesting proposals, the Secretary published the Notice of Hearing, 64 Fed. Reg. 20094–20104 (April 14, 2000), listing 31 proposals from industry and a standard proposal from the Secretary included in all hearing notices. There was no proposal to create a separate Class III Butterfat price. On the second day of the five day hearing in May 2000, a Dr. Barbano attempted to discuss his idea for a new Class III Butterfat price. The ALJ presiding over the hearing, with the explicit agreement of the Secretary's representative at the hearing, found that "Dr. Barbano's pricing formula is not one of the proposals being considered at this hearing." Mem. of P. & A. in Supp. of Pls.' Mot. For T.R.O. and/or Prelim. Inj. and for Expedited Hr'g at 16, (Jan. 19, 2001) (*citing* Hr'g Tr. at 790–91, dated May 9, 2000) ("Pls.' Mot. for Prelim. Inj.").

During the remainder of the hearing no participant testified or offered any evidence for the creation of a separate Class III butterfat price. After the hearing the record closed and on December 7, 2000 the Secretary issued a Tentative Final Decision at Fed.Reg. 76832. *See also* 65 Fed. Reg. 82832 (December 28, 2000). The Tentative Final Decision surprised all of the participants in the hearing because it created a separate Class III Butterfat price provision and made changes to numerous other parts of the FMMO to implement this change, taking up virtually all of the nine pages of amendments. The Secretary denied requests from several participants for an administrative stay of the Tentative Final Decision and the regulation became effective on January 1, 2001. But because the price announcement for January 2001 takes place on February 2,

2001, plaintiffs were afforded a brief opportunity to seek equitable relief from this Court.

Plaintiffs sought a preliminary injunction on the grounds that the Secretary had unlawfully failed to comply with the appropriate procedural requirements for amending the Federal Milk Marketing Order System. On January 31, 2001 this Court entered a preliminary injunction that enjoined the Secretary of the Department of Agriculture from implementing a separate Class III Butterfat Price in the nation's Federal Milk Order System. *See* Order Granting Prelim. Inj., January 31, 2001. The Court noted that the "public interest will be served if the Court maintains the status quo with respect to the Class III Butterfat Price until it has resolved the underlying claims presented by the Milk Producers' Complaint." *Id.*

The amended regulations provided for a separate Class III Butterfat price and the Secretary intended to announce the new separate Class III Butterfat price on February 2, 2001. · The new price would be retroactive to January 1, 2001 and would cause an immediate change in milk prices for January milk deliveries. The preliminary injunction prohibited the Secretary from implementing the provisions for the new Class III Butterfat price and directed the Secretary to make specific changes in the Tentative Final Decision appearing at 65 Fed.Reg. 82832 in order to return the regulations to the state that existed before the Tentative Final Decision became effective on January 1, 2001.

This Court found that plaintiffs met all of the requirements for a preliminary injunction. First, plaintiffs would suffer irreparable injury and would be unable to recover the immediate losses stemming from the implementation of the separate Class III Butterfat price by any means at law. Second, plaintiffs were likely to succeed on the merits of their claims. In fact during the hearing on the preliminary injunction this Court determined that "the Secretary ... had the right to make both proposals and issues in her notice, but she ... clearly did not give fair notice to the industry." Tr. at 47–48. Third, the public interest would be served by the injunction. Fourth, the Secretary would not suffer harm if enjoined.

Following the entry of the preliminary injunction the Secretary had limited options. The 2000 Act mandated specific deadlines for the Secretary. If the Court struck down the Tentative Final Decision via a final judgment or permanent injunction, then the failure to undertake new rulemaking during the preliminary injunction would leave the Secretary in violation of the 2000 Act's January 1, 2001 deadline.[1] Either the case could be pursued to final judgment or the Secretary could remedy the underlying wrong and undertake new rulemaking during the preliminary injunction. As this Court clearly spelled out its opinion of the rulemaking process at issue during the hearing on the preliminary injunction, the Secretary chose the only viable option and conducted rulemaking afresh. This process resulted in the publication of a new final regulation that took effect on April 1, 2003. The new regulation did not include a separate Class III Butterfat price. But the Court does not rely on the fact that in the final rule, after adhering to the appropriate rulemaking procedure, the Secretary chose not to in-

---

1. The 2000 Act states: "In the event that the Secretary of Agriculture is enjoined or otherwise restrained from by a court order from implementing a final decision within the time period specified in subsection (c), the length of time for which that injunction ... is effective shall be added to the time limitations specified in subsection (c) ..." 2000 Act See.2(d).

clude a separate Class III Butterfat price because this suit was based upon the fact that the initial rulemaking process used by the Secretary was in violation of the AMAA and its related regulations. Plaintiffs dismissed the case because they obtained their desired result in the form of proper procedural process in the enactment of a new amended regulation—all of which was the result of the preliminary injunction. On May 30, 2003, plaintiffs moved for award of fees and costs pursuant to the Equal Access for Justice Act.

### ANALYSIS

Plaintiffs request fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2003).[2] The Court must consider three separate issues: whether plaintiffs are prevailing parties, whether the Secretary's position was substantially justified, and what fees and costs submitted by the plaintiffs are allowable.

#### A. Plaintiffs Are A "Prevailing Party"

■ The analysis of plaintiffs' status as a prevailing party takes place in light of the Supreme Court's holding in *Buckhannon Bd. and Care Home Inc., v. W. Va. Dept. of Health and Human Res.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (*"Buckhannon"*) and the D.C. Circuit's subsequent application of *Buckhannon* in *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486 (D.C.Cir.2003) (*"Thomas"*). In *Buckhannon*, the plaintiffs operated assisted living residences in West Virginia and sued the state of West Virginia seeking relief that certain state laws violated provisions of the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.* and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* While the case was pending and before the court had granted any relief of any kind, the West Virginia legislature enacted two bills eliminating the state law provisions at issue. Subsequently defendant moved to dismiss the case as moot and the court granted the motion. Plaintiffs then requested attorney's fees as the prevailing party under the FHAA. Plaintiffs argued they were entitled to fees under the cata-

---

**2.** The relevant portions of 28 U.S.C. § 2412 states:

(a)(1) Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation. . . .

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award. . . .

(d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

lyst theory, which asserts that a plaintiff is a prevailing party "if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon*, 532 U.S. at 601, 121 S.Ct. 1835. The Supreme Court held the catalyst theory "is not a permissible basis for the award of attorney's fees under the FHAA and ADA" *Id.* at 598, 121 S.Ct. 1835. The seemingly limited scope of this holding is belied by its subsequent interpretation by the D.C. Circuit in *Thomas*. In *Thomas,* discussed further *infra,* the D.C. Circuit rejected the district court's understanding of *Buckhannon* as a rejection of the catalyst theory as "much too narrow" and concluded instead that "*Buckhannon* is, first and foremost, about the meaning of the term 'prevailing party' in civil litigation under certain fee-shifting statutes." *Thomas*, 330 F.3d at 492. Thus a closer examination of *Buckhannon* is required.

In *Buckhannon,* the Supreme Court surveyed its precedent on the issue of prevailing parties and made several determinations. First, the Court observed that the term "prevailing party" is a legal term of art and that in accordance with both its precedent and Black's Law Dictionary, a prevailing party "is one who has been awarded some relief by the court." *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 1835. Second, the Supreme Court considered two particular forms of relief that qualified. The Court found that a plaintiff must "receive at least some relief on the merits of his claim before he can be said to prevail." *Id.* at 604, 121 S.Ct. 1835 (*quoting Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)). But "even an award of nominal damages suffices under this test." *Id.* (*citing Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). In contrast, the Court also noted that a settlement agreement enforced through a consent decree

could serve as the basis for an award of attorney's fees. *Id.* (*citing Maher v. Gagne* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)). The Court observed the consent decree "does not always include an admission of liability by the defendant" but "it nonetheless is a court ordered change in the legal relationship between the plaintiffs and the defendant." *Id.* (*citing Texas State Teachers Assn. v. Garland Independent School Dist.,* 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). The Court combined these concepts stating: "These decisions, taken together, establish that enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* (*quoting Texas State Teachers Assn.,* 489 U.S. at 792, 109 S.Ct. 1486). The Court further observed that the catalyst theory "falls on the other side of the line from these examples." *Id.* at 605, 121 S.Ct. 1835. Likewise, neither the reversal of a dismissal for failure to state a claim, nor the reversal of a directed verdict for the defendant was a sufficient success to make the plaintiff a prevailing party. At no point did the Court evaluate whether or not a preliminary injunction would be sufficient to make a party a prevailing party in order to obtain an award of fees and costs.

In *Thomas v. National Science Foundation,* the D.C. Circuit considered the effect of *Buckhannon* in a case where the district court awarded fees based on a preliminary injunction and partial summary judgment in favor of plaintiffs. Plaintiffs were a class of Internet Domain Name registrants who sued the National Science Foundation ("NSF") over a portion of Internet Domain Name registration fees that went to the NSF on the grounds that such fees constituted an unconstitutional tax. The district

court entered a preliminary injunction prohibiting NSF from spending any of the fees collected, but did not stop the collection of the fees. The district court also granted partial summary judgment to the plaintiffs finding the "tax" unconstitutional. But it did not award any damages to the plaintiffs, or otherwise order the NSF to divest the collected funds. Before the district court could render final judgment, Congress mooted the case by enacting legislation that approved the collection of the fees as a tax and did so retroactively. The district court then vacated the preliminary injunction and dismissed the case.

The *Thomas* plaintiffs then filed a request for fees under the EAJA on the grounds that they were prevailing parties because they had obtained a preliminary injunction and the court had entered partial summary judgment on the issue at the heart of the case. The district court found that the preliminary injunction and partial summary judgment were sufficient to make plaintiffs prevailing parties. *Id.* at 490. The D.C. Circuit rejected both of those grounds. It held that *Buckhannon* should be interpreted more broadly and set forth a discussion of those elements of the Supreme Court's opinion discussed *supra*. The D.C. Circuit stated that "neither the preliminary injunction nor the partial summary judgment changed the legal relationship between [plaintiffs] and NSF in a way that afforded [plaintiffs] the relief that they sought." *Id.* at 493.

The preliminary injunction in *Thomas* was not a sufficient ground for awarding fees because it served only to preserve the status quo pending final adjudication and "did not change the legal relationship between the parties in a way that afforded [plaintiffs] the relief they sought in the lawsuit." *Id.* The preliminary injunction in that case had the sole effect of "prevent[ing] NSF from appropriating any

money already collected from the registration assessment." *Id.* The injunction did not stop NSF from collecting any additional monies from ongoing registrations. Thus a member of the plaintiff class who needed to reregister an Internet Domain Name after the entry of the preliminary injunction still had to pay the full registration fee, a portion of which would go to NSF, just as required before the preliminary injunction.

There are two separate reasons why *Thomas* does not require this Court to deny plaintiffs' prevailing party status because they only obtained a preliminary injunction. First, the preliminary injunction in this case did create a material alteration in the legal relationship between the parties as required under *Buckhannon* and *Thomas*. Second, the change in the parties' legal relationship that resulted from the preliminary injunction was the exact relief that plaintiffs sought. Further explanation is necessary.

This Court's use of the term "status quo" in its preliminary injunction incorrectly conveys the state of affairs after the entry of the injunction. Prior to the entry of the injunction the Secretary had affirmatively issued amended regulations that provided for a separate Class III Butterfat price. These regulations were fully in existence and effective as of January 1, 2001, *see* 2000 Act at Sec. 2(c), and only awaited the issuance of the price itself—scheduled for February 2, 2001—to have a physical effect on the market. These newly issued amended regulations governed milk transactions taking place in January 2001, prior to the preliminary injunction, but awaited the price before the relevant parties could compute the payments for January 2001 deliveries. If the injunction had truly preserved the status quo it would have only enjoined the Secretary from dictating the price but left the newly amended regula-

tions in place. Instead, the preliminary injunction enjoined the newly implemented amended regulations, made affirmative changes to the order language appearing at 65 Fed.Reg. 82832, and restored the pricing system in place prior to the implementation of the amended regulations. The fact that plaintiffs had yet to suffer monetary damages under the new system is irrelevant as one of the very purposes of the preliminary injunction is to prevent irreparable injury.

Second, the preliminary injunction is exactly the relief sought by plaintiffs. As the D.C. Circuit stated in *National Black Police Association v. District of Columbia Board of Elections and Ethics,* "[t]he relief they ultimately won was specifically the relief they requested." 168 F.3d 525, 529 (D.C.Cir.1999). Further, in *Farrar,* the Supreme Court stated that "plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Farrar,* 506 U.S. at 109, 113 S.Ct. 566. In fact, a preliminary injunction was the only effective relief they could seek. The retroactive nature of the price announcement meant that on February 2, 2001, plaintiffs would be subject to an immediate loss of an estimated $5,000,000. Pls.' Mot. for Prelim. Inj. at 2. This loss is the result of third party transactions based on the issued price and is not recoupable as damages at law from the Secretary, who is protected by sovereign immunity. Thus no subsequent final judgment on the merits or consent decree could award plaintiffs effective relief. This Court's entry of a preliminary injunction was the only procedural device that represented victory for the plaintiffs.

Subsequent to the drafting of much of this opinion, the D.C. Circuit provided further guidance on the recovery of attorney fees under the EAJA in *Role Models America, Inc., v. Brownlee,* 353 F.3d 962 (D.C.Cir.2004). In *Role Models* plaintiffs applied for a preliminary injunction to prevent the Secretary of the Army from transferring a closed military installation called Fort Ritchie because the Secretary had failed to observe the procedural requirements for disposing of a closed military facility. Although the district court denied the request, the Court of Appeals reversed and ordered the district court to enter a " 'permanent injunction against conveyance of the Fort Ritchie property until the Government remedies the procedural errors' it had committed." 353 F.3d at 965 (*quoting Role Models Am. Inc., v. White,* 317 F.3d 327, 333–34 (D.C.Cir. 2003)). Subsequently, the plaintiff applied directly to the Court of Appeals for attorneys' fees under the EAJA. In finding the plaintiff a prevailing party, the Court of Appeals stated that because "Role Models obtained not only a remand to correct procedural errors, but also an injunction barring the Secretary from transferring Fort Ritchie until he complied with applicable regulations" they obtained the sort of " 'change in someone's primary conduct in the real world ... [such as by the] imposition of a restriction on others' " that makes a party a prevailing party. *Id.* at 966 (*quoting Waterman Steamship Corp. v. Maritime Subsidy Bd.,* 901 F.2d 1119 (D.C.Cir.1990)). The court's statement applies here as well. The preliminary injunction entered by this Court caused a change in the primary conduct of the Secretary. The Secretary was enjoined from implementing the regulations at issue and the changes to the regulations were entered by order of the Court.

The *Role Models* court further noted that even where an administrative agency reissues the same rule using correct procedures after a rule is vacated by a Court for

failure to provide notice and comment, the plaintiff can still be a prevailing party because " '[i]n the real world of the APA . . . an opportunity for comment . . . is not to be denigrated.' " *Id.* at 966 (*quoting Environmental Defense Fund, Inc., v. Reilly,* 1 F.3d 1254 (D.C.Cir.1993)). Whether or not plaintiff obtains a favorable administrative outcome does not denigrate what plaintiff achieved through the preliminary injunction—"the functional equivalent of vacating the rule." *Id.* As applied to this case, this lends further support to this Court finding plaintiffs a prevailing party. Plaintiffs obtained both results, an injunction that effectively vacated the rule promulgated by the Secretary and a final rule that incorporated plaintiffs' comments. This Court finds plaintiffs to be prevailing parties.[3]

## B. The Secretary's Position Was Not Substantially Justified

■ According to the statute, no award can be given if "the court finds that the position of the United States was substantially justified . . ." 28 U.S.C. § 2412(d)(1)(A). The burden of proof of establishing substantial justification is on the Secretary. *Lundin v. Mecham,* 980 F.2d 1450, 1459 (D.C.Cir.1992). Substantial justification is present if the defendant's position was "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* 487 U.S. 552, 560, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

■ The Secretary's promulgation of a separate Class III Butterfat price was not substantially justified. First, the Notice of Hearing listing the proposals for consideration did not make it clear that the issue of

a separate Class III Butterfat price would be part of the hearing. Second, to the extent that the language of the Notice of Hearing presented any ambiguity at all, the ruling of the ALJ closed off that area of discussion. As noted above, the Secretary's representative at the hearing affirmatively concurred with the ALJ that a separate Class III Butterfat price was not part of the proposals submitted for consideration. Dr. Barbano's testimony on the issue was determined by the ALJ and the Secretary's representative to be beyond the scope of the hearing and off limits to further discussion. The Secretary then published nine pages of amendments which dealt almost exclusively with the issue of a separate Class III Butterfat price.

■ Further, after the Secretary published the tentative final decision on December 7, 2000, numerous groups, including plaintiffs, requested an administrative stay from the Secretary on the grounds that the newly published decision was beyond the scope of the hearing and that they had been unlawfully denied an opportunity to comment and provide evidence on the issue. The Secretary was on notice that various groups found the amended regulations in violation of the procedural requirements of the AMAA and the APA. The Secretary denied these requests. This failure to confront these concerns and force plaintiffs to file suit is further evidence of a lack of substantial justification of the underlying acts. *See Lundin,* 980 F.2d at 1460–61.

## C. The Fee Award

■ Plaintiffs request attorney's fees, expenses, and costs and submitted a rec-

---

**3.** Plaintiffs could also be considered prevailing parties because plaintiffs and defendant cooperated to draft the language in Attachment 1 to the Court's preliminary injunction. The subsequent use of that attachment in the Court's order could be conceived of as a con-

sent decree. But such an approach only highlights the problem. When a flexible term is stiffened, often others are bent to shoehorn in those circumstances that have just been excluded.

ord of such to the Court. Plaintiffs bear the burden of establishing entitlement to fees sought. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). 28 U.S.C. 2412(d)(2)(A) sets the hourly rate available to attorneys, stating: "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved justifies a higher fee." The parties concur in their respective briefs to the Court that the appropriate cost of living adjusted rates are as follows: $138.25 for 2000, $142.18 for 2001, $144.43 for 2002, and $147.13 for 2003. *See, e.g. Chen v. Slattery,* 842 F.Supp. 597 (D.D.C.1994) (explaining the appropriate formula for cost of living adjustments).

### 1. The Hourly Rate

■ Plaintiffs' fee application requests that the Court compensate plaintiffs' counsel at what appear to be the normal hourly rates each attorney charges private clients. Defendant sensibly objects to these hourly rates and asserts that the EAJA statutory cap should apply for all attorneys. Def.'s Opp'n to Pls.' Application for Fees, Costs, and Expenses at 9–10 (July 1, 2003) ("Def.'s Opp'n"). The Court does have the power to increase the rate where a "special factor" exists. 28 U.S.C. 2412(d)(2)(A). The Supreme Court interpreted this language to mean attorneys "having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of generally lawyerly knowledge and ability useful in all litigation." *Pierce v. Underwood,* 487 U.S. 552, 572, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). Factors not to be considered included the difficulty of the issues, the ability of counsel, or the results obtained in the litigation. *Id.* at 573, 108 S.Ct. 2541.

The D.C. Circuit further elaborated on *Pierce* in *Truckers United For Safety v. Mead,* 329 F.3d 891 (D.C.Cir.2003). In *Truckers United,* the court "declined to construe EAJA's fee enhancement provision in a liberal fashion." 329 F.3d at 895. The court noted that according to its ruling in *F.J. Vollmer Co. v. Magaw,* "nothing in EAJA or its legislative history indicates that the Congress intended to entitle 'all lawyers practicing administrative law in technical fields' to a fee enhancement" and thus the court refused to recognize " 'expertise acquired through practice' as a special factor warranting an enhanced fee." *Id.* (quoting *F.J. Vollmer Co. v. Magaw,* 102 F.3d 591, 598–99 (D.C.Cir. 1996)). But the Court did not decide whether the attorney's expertise in the safety aspects of the trucking industry was a special factor and instead reversed the fee enhancement granted by the district court on the grounds that such specialized knowledge was not "needful for the litigation in question." *Id.* at 896 (quoting *Pierce,* 487 U.S. at 572, 108 S.Ct. 2541). Given that the underlying suit was over whether or not the Inspector General "lacked the legal authority to conduct investigations into motor carrier compliance" the court concluded that the specialized expertise in trucking safety was "at best [ ] tangential to the underlying litigation." *Id.* at 893, 896.

The Court must therefore undergo two analyses in the instant case: whether or not specialized knowledge of the FMMO and the AMAA is a special factor under the EAJA, and whether or not such specialized knowledge was "needful for the litigation in question." As to the first question, the Court finds that specialized knowledge of the FMMO and the AMAA is a special factor meriting an increased rate under the EAJA. The FMMO and the provisions of the AMAA are extremely

complex. An attorney must have specialized skill to "traverse the labyrinth of the federal milk marketing regulation provisions." *Zuber v. Allen,* 396 U.S. 168, 172, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). *See also Suntex Dairy v. Block,* 666 F.2d 158, 160 (5th Cir.1982) (describing federal milk regulations as "a highly complex scheme"). As observed in *Queensboro Farms Products v. Wickard*:

> The milk problem is exquisitely complicated. The city dweller or poet who regards the cow as a symbol of bucolic serenity is indeed naive.... The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government.

137 F.2d 969, 974 (2d Cir.1943). However, that such knowledge is a special factor does not end the inquiry.

■ The second issue is whether or not this specialized knowledge is needful for the litigation. At first glance this case appears to be solely a dispute over the Secretary's failure to promulgate new milk regulations in accordance with the proper procedures required by statute, that the statute at issue is the AMAA rather than the APA does not change the fact that litigating over compliance with notice procedures is plain vanilla administrative practice. Where the specialized knowledge of the FMMO comes into play is in two specific areas. First, to obtain a preliminary injunction requires a showing of irreparable injury. As plaintiffs discussed at length in their motion for preliminary injunction, the impact of the challenged regulations would have been severe. Pls.' Mot. for Prelim. Inj. at 18. Plaintiffs carefully and thoroughly documented the ways that they and others would be affected when the regulations took effect, includ-

ing a complex economic model that calculated the unrecoverable harm in dollars that plaintiffs would suffer. *Id.* at 22, 28. In fact, plaintiffs showed exactly how the Secretary's poor economic modeling overlooked important consequences of the new rule, failed to take all relevant information into account, and did not anticipate the harm to plaintiffs or other similarly situated parties. As an aside, the Court notes but does not rely upon the fact that the final rule, promulgated with the input of the industry, did not include the challenged provisions—a further testament to the validity of plaintiffs' analysis. Absent specialized knowledge of how the FMMO operates, plaintiffs' counsel could not have prepared the irreparable injury arguments or economic models necessary to obtain the preliminary injunction. Furthermore, plaintiffs' counsel also utilized specialized knowledge of the FMMO in drafting the attachment to the preliminary injunction that directed the Secretary to make specific itemized changes to the Interim Final Order. Even the most cursory glance at the attachment will reveal that it could not have been drafted without specialized knowledge far exceeding that which could be obtained by a "competent practicing attorney with access to a law library and other accoutrements of modern legal practice." *In re Sealed Case,* 254 F.3d 233, 236 (D.C.Cir.2001). Actually, the alternative to using such specialized attorneys is the result in *Role Models* where "fourteen individuals logged a total of 1058 hours in connection with the appeal and with the preparation of its fee petition." 353 F.3d at 968.

The Court's careful analysis of plaintiffs' counsels' contemporaneous time records reveals that although these records are sufficient for purposes of generating and submitting a bill for clients, they are not sufficiently detailed to allow the Court to extract and compensate for those particu-

lar hours spent on aspects of the preliminary injunction that required the specialized skill. Instead, the Court undertook a thorough examination of plaintiffs' motion for preliminary injunction and related papers, considered the content and nature of the hearing, and reviewed all the facts and circumstances surrounding this litigation and determined that the Court will grant an enhanced fee for one third of the hours that attorneys with specialized knowledge spent towards obtaining the preliminary injunction. This award is intended to capture those hours where plaintiffs' counsels' specialized knowledge of the FMMO was "needful to the litigation in question." *Pierce*, 487 U.S. at 572, 108 S.Ct. 2541.

■ The Court must now identify the plaintiffs' attorneys that possessed the specialized knowledge of the FMMO and that used that knowledge in the relevant aspects of the litigation. Attorney Yale specializes in the representation of dairy farms and dairy cooperatives, worked in the dairy industry prior to becoming an attorney, and has the requisite distinctive knowledge of the FMMO and AMAA to qualify for a higher rate under the EAJA. *See* Pls.' Reply to Def.'s Opp'n to Pls.' Application for Fees, Costs, And Other Expenses, at 10 (July 18, 2003) ("Pls.' Reply"); Decl. of Benjamin F. Yale, Ex. B to Mem. in Supp. of Application for Fees, Costs, and Other Expenses (May 30, 2003). The Court will award fees for Attorney Yale at his requested rate of $325/hour for one third of the hours spent towards the preliminary injunction, less any travel hours, which will be compensated at the EAJA rate. Attorney Barnes has spent over three decades representing dairy cooperatives on issues relating to the AMAA. Pls.' Reply at 10. Based on this and the expertise displayed at the hearing on the preliminary injunction, the Court will award fees for Attorney Barnes at his requested rate of $385/hour for one third of the hours spent towards the preliminary injunction. The Courts finds that no other attorneys possess specialized knowledge of the FMMO and the AMMA and thus all other attorneys will receive at a maximum the cost of living adjusted EAJA rates.

### 2. The Hours Spent

■ Defendant further objects to "hundreds of hours for two years when there were no court proceedings." Def.'s Opp'n at 1. But an examination of the time records submitted by plaintiffs in their motion reveals that the total of all hours billed by all attorneys from the day after the entry of the preliminary injunction to the dismissal of the case two years and three months later totals to a scant 39 hours. Mem. in Supp. of Application for Fees, Costs, and Other Expenses at Ex. C. The Court does not find this number of hours unreasonable given the complexity of the issues and the fact that approximately half of those hours were spent in the two weeks immediately following the entry of the preliminary injunction—a time when plaintiffs' attorneys could be expected to spend additional hours because the preliminary injunction made specific changes to the FMMO regulations and the attorneys could reasonably be expected to follow up to make sure the changes operated as intended. The remaining hours until the dismissal of the case were spent partly as a result of defendant's own litigation conduct. Defendant's tactics in the litigation resulted in ongoing Court involvement in the case and entry of several orders. Plaintiffs' counsel spent a minimal and otherwise acceptable amount of time on these matters.

■ The Court further notes defendant's objections to particular categories of hours. Defendant objects to time spent by plaintiffs' attorneys in December 2000 on

the grounds that it is time spent on "administrative rulemaking proceedings." *NAACP v. Donovan,* 554 F.Supp. 715, 720 (D.D.C.1982) (finding that the legislative history of the EAJA intended to exclude rulemaking and other proceedings). In December 2000, following the publication of the Tentative Final Decision, plaintiffs filed a motion requesting an administrative stay of a portion of the Tentative Final Decision. *See* Ex. F to Pls.' Mot. for Prelim. Inj. Plaintiffs' filed the motion "pursuant to 7 C.F.R. part 900." *Id.* 7 C.F.R. part 900 provides the regulations that govern hearings held to amend regulations promulgated under the AMAA. Thus it appears to this Court that plaintiffs' motion to stay was submitted as part of the administrative rulemaking. Plaintiffs do not cite, and this Court has not found, any authority for the proposition that such a motion was part of an "adversary adjudication" under 28 U.S.C. 2412(d)(3). *See Indep. Bankers Ass'n of Georgia v. Bd. of Governors of Fed. Reserve Sys.,* 516 F.2d 1206 (D.C.Cir.1975) (noting that adjudicatory hearing procedures are used in individual cases where the outcome is dependent on the resolution of particular "adjudicative facts"). The Court finds that those hours billed in relation to the motion for a stay are not compensable as the motion for a stay was submitted pursuant to regulations governing administrative rulemaking procedures. The Court therefore makes a deduction of 24 hours from Attorney Yale's December 2000 hours.

Defendant makes relevant objections to attorney hours spent on a pro hac vice motion, conversing with the press, and filing and serving documents. In *Role Models,* the D.C. Circuit refused to compensate counsel for time spent: conversing with the press, working on application for admission to the D.C. bar, or filing briefs.

353 F.3d at 973. The time records supporting plaintiffs' fee request specifically indicate 6.75 hours spent on these tasks and 1 hour that was inadequately labeled. Several other entries include these tasks in entries that lump together multiple tasks. After examining these entries the Court will deduct an additional 5 hours to compensate for the objectionable tasks detailed in a single entry and for any other inadequate time records for a total reduction of 12.75 hours.

Defendant further requests a downward reduction of 25% on all of plaintiffs' hours on the grounds that the hours are excessive and resulted in part from overstaffing. Def.'s Opp'n at 16. In this analysis the Court is guided by the D.C. Circuit's maxim in *Copeland v. Marshall* that "billing judgment" means only billing one's adversary for hours that one would bill to one's client. 641 F.2d 880, 891 (D.C.Cir.1980). In this regard, plaintiffs assert that all attorney hours claimed in their application have been billed to and paid for by the clients. Pls.' Reply at 16. Furthermore, given the complexity of the FMMO, see discussion *infra,* the Court finds that, subject to the specific deductions noted herein, the amount of hours submitted was reasonable.

### 3. Compensable Hours Calculations

In accordance with the prior analysis on enhanced fees the Court makes the following calculations. Attorney Yale's total time spent on the preliminary injunction was 218.3. This sum represents 11.9 hours in December 2000—the net remaining hours after the Court deducted 24 hours for work on administrative matters—plus 202.4 hours for January 2001. From this number the Court subtracts 36.1 hours for time spent in travel in January 2001 leaving 178.2 hours. The Court awards Attorney Yale his requested rate

of $325/hour for 58.8 hours (one third of the total of 178.2 hours) for fees of $19,110. The remaining compensable hours will be paid at the appropriate EAJA rate. There are 7.9 hours in 2000 (two thirds of 11.9) paid at $138.25 per hour for a total of $1092.18. The total remaining compensable hours in 2001 equal 131.6. This represents the aforementioned 178.2 hours minus 58.8 hours (those paid at the higher rate) minus 7.9 hours (those paid at year 2000 EAJA rates) minus 2 hours (time spent talking to the press) plus 4 hours (time spent in February 2001) plus 18.1 hours (one half the hours spent in travel).[4] Applying the 2001 EAJA cost of living adjusted rate of $142.18 to the remaining 131.6 hours results in fees of $18,710.89. The grand total of Attorney Yale's compensation is then $38,913.06 ($19,110 + $1,092.18 + $18,710.89).

The Court awards Attorney Barnes an enhanced rate for one third of his hours expended toward the preliminary injunction. Attorney Barnes recorded 135 hours in 2001 before the entry of the preliminary injunction on January 31, 2001. Attorney Barnes requested enhanced rate is $385/hour, an amount the Court finds appropriate given his specialized knowledge. Awarding $385/hour for 45 hours (one

third of 135) results in a fee of $17,325. The remaining 90 hours will be compensated at the appropriate EAJA rate.

No other attorney possessed expertise in FMMO and AMAA so all remaining hours will be compensated at the appropriate EAJA rates. Hours recorded in 2001 include 116.75 hours for Attorney Barnes (161.75 total hours in 2001 minus 45 hours at the enhanced rate) and 97.25 hours for Attorney Patterson for a total of 214 hours from which the Court deducts 4 hours.[5] The fee for the remaining 210 hours is $29,857.80 (210 × $142.18).

In 2003 Attorneys Barnes, Castro, Miltner, and Illingworth recorded a combined total of 83.5 hours. The 2003 rate under the EAJA is $147.13, an amount well below the requested billing rate of each attorney respectively. As there is no evidence of special factors, the Court will award fees of $12,285.36 for these hours (83.5 x. $147.13).

The total fee award is then $98,381.22 ($38,913.06 + $17,325 + $29,857.80 + $12,285.36).[6]

## D. Expenses and Costs

 Plaintiffs request compensation for expenses and costs in the amount of

---

4. Travel time is compensated at one-half the appropriate hourly rate. *See Cooper v. U.S. Railroad Retirement Bd.*, 24 F.3d 1414, 1417 (D.C.Cir.1994). The Court finds no reason to pay for travel time, even reduced by half, at any rate other than the EAJA rate.

5. Attorney Kehoe recorded 5 hours in 2001 but all five hours were spent performing secretarial type tasks and will not be compensated. S. Flores recorded 1.75 hours in 2001. But .75 hours were described as "Filing to Court" and an additional 1.0 hour was inadequately described as "research for Lowell Patterson." These hours will not be compensated. The Court has deducted 2.0 hours from Attorney Yale for conversations with the press, 6.75 for Attorney Kehoe and S. Flores and will deduct the remaining 4 hours from

the time spent by Attorneys Barnes and Patterson.

6. In response to Court order plaintiffs submitted their contemporaneous time records on January 20, 2004. The contemporaneous records showed additional hours expended by various attorneys in excess of those reported in plaintiffs' initial motion filed on May 30, 2003. Plaintiffs provided no explanation for why these hours, which accrued prior to filing the initial motion, were not included in the original motion. As plaintiffs bear the burden in this matter the Court will not crunch endless data to compensate for plaintiffs' lack of thoroughness and so ignores any hours in the detailed records that were not included in the summary records attached to plaintiffs' initial motion for fees.

$10,563.88. Pls.' Reply at 16. But the Court finds that only the filing fee, copying, transcripts, and research are compensable. *See Massachusetts Fair Share v. Law Enforcement Assistance Admin.*, 776 F.2d 1066, 1069 (D.C.Cir.1985) (stating that of duplication expenses, taxi fares, messenger services, travel expenses, telephone bills, and postage only duplication expenses were recoverable under the EAJA); 28 U.S.C. § 2412(d)(1)(A) (2003) (allowing an award of costs pursuant to subsection (a), which in turn references costs under 28 U.S.C. § 1920); *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Labor*, 962 F.Supp. 191 (D.D.C.1997) (allowing legal research expenses to be recovered under the EAJA); *see, e.g. Action on Smoking and Health v. C.A.B.*, 724 F.2d 211, 224 (D.C.Cir.1984); and *Hirschey v. F.E.R.C.*, 777 F.2d 1, 6 (D.C.Cir.1985). All of plaintiffs' other requested expenses are denied. Thus plaintiffs are entitled to $150.00 filing fee, $2075.61 for transcripts and copying, and $660 for online legal research, for a total of $2885.61.

In total plaintiffs shall receive $98,381.22 in attorneys' fees and $2,885.61 in costs for a grand total of $101,266.83.

### CONCLUSION

Pursuant to 28 U.S.C. § 2412(a) and (d) and the reasons stated above this Court shall order the United States Department of Agriculture to pay the plaintiffs Select Milk Producers, Inc., Elite Milk Producers, Inc., Continental Dairy Products, Inc., a total of $101,266.83 in attorney's fees, expenses, and costs incurred in the course of this action. A separate order shall issue this date.

### ORDER

In accordance with the Memorandum Opinion issued this date and upon consideration of plaintiffs' application for fees, expenses, and costs incurred in their prosecution of this action, the opposition thereto, the reply brief, and the applicable law: the Court hereby grants plaintiffs' application for an award under the Equal Access to Justice Act, 28 U.S.C. § 2412.

It is hereby ORDERED that the United States Department of Agriculture shall pay plaintiffs Select Milk Producers, Inc., Elite Milk Producers, Inc., and Continental Dairy Products, Inc., the sum of $101,266.83 in compensation for fees, expenses, and costs incurred in this action.