**F.J. VOLLMER COMPANY,
INC., Appellant,**

v.

**John W. MAGAW, Director, Bureau of Alcohol, Tobacco & Firearms, U.S. Department of the Treasury, Appellee.**

No. 95–5187.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 15, 1996.

Decided Dec. 24, 1996.

Stephen P. Halbrook, Fairfax, VA, argued the cause and filed the briefs for appellant.

Fred E. Haynes, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

This case presents a recurring question under the Equal Access to Justice Act: In evaluating a claim for fees under the Act, what standard of reasonableness should a court use to determine whether an agency's action was "substantially justified"? In the case before us, this court previously overturned a decision by the Bureau of Alcohol, Tobacco and Firearms, holding the Bureau's action was inconsistent with the governing statute and would have produced an "incredible" result. The district court nonetheless found the agency's decision to have been substantially justified and thus denied petitioner reimbursement for fees and expenses. Reviewing the district court's ruling under the deferential abuse-of-discretion standard, we conclude that the agency's position was not substantially justified because it was wholly unsupported by the text, legislative history, and underlying policy of the governing statute. Although we thus grant petitioner's request for fees and expenses, we deny reimbursement at an enhanced rate and reduce the fee amount to reflect petitioner's less than complete success.

I

In an effort to restrict the availability of machineguns, Congress amended the Gun Control Act in 1986, making it illegal to possess or transfer any machinegun except one lawfully possessed before the amendment's May 19, 1986, effective date or one possessed or transferred "by or under the authority of, the United States ... or a State...." 18 U.S.C. § 922(o) (1994). The Gun Control Act takes its definition of "machinegun" from the National Firearms Act. Id. § 921(a)(23). According to that definition, machineguns include:

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger[,] .... the frame or receiver of

any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. .

26 U.S.C. § 5845(b) (1994). A weapon's receiver is the frame "which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 179.11 (1996). The group of parts used to convert a non-automatic weapon for automatic fire is called a machinegun conversion kit.

At the time Congress amended the Gun Control Act, petitioner, F.J. Vollmer Co., a firearms manufacturer, possessed 175 machinegun conversion kits. Under the terms of the 1986 amendment, these kits were legally transferable machineguns. In order to determine which receivers the kits could be combined with for sale as complete weapons, Vollmer submitted two transfer applications to the Bureau. In both applications, Vollmer proposed combining machinegun conversion kits with semiautomatic receivers, i.e., receivers designed as parts of weapons that shoot only one shot with each pull of the trigger. The receivers in the two applications differed, however, in one crucial respect. The receiver in the first application had been converted into a machinegun receiver after May 19, 1986, the effective date of the Gun Control Act's machinegun prohibition. In the second application, Vollmer modified a similar receiver a second time, returning it to its original semiautomatic state. The Bureau denied the first application, concluding that the receiver qualified as a prohibited machinegun and that its combination with a legally possessed machinegun conversion kit could not alter its illegal status. Even though the receiver covered by the second application was physically indistinguishable from a brand new, perfectly legal semiautomatic receiver, the Bureau also treated it as a prohibited machinegun because Vollmer had converted it into a machinegun receiver after May 19, 1986. It thus denied Vollmer's second application as well.

The district court upheld the Bureau's denial of both applications. This court agreed with the district court concerning the denial of the first application, but reversed the district court and overturned the Bureau's denial of the second application for several reasons. *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448 (D.C.Cir.1994). First, the Bureau offered no reasoning supporting its once-a-machinegun-always-a-machinegun reading of the National Firearms Act. *Id.* at 451. Second, although the Bureau asserted in court that its rejection of the application rested on its determination that the twice reconfigured semiautomatic receiver was "potentially restorable" to being a machinegun receiver, the Bureau made no findings of fact to support that claim. *Id.* Third, the Bureau's position conflicted with its own enforcement manual, which allowed exclusion of a weapon from Firearms Act coverage through removal of the feature that led to its classification as a firearm under the Act. *Id.* at 451–52. Finally, the Bureau's reading of the Firearms Act led to the "incredible" conclusion that every semiautomatic receiver manufactured after May 19, 1986, must be considered readily restorable to being a machinegun receiver and thus a prohibited machinegun under the Gun Control Act. *Id.* at 452.

■ Vollmer then sought reimbursement for fees and expenses pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412 (1994). That Act provides that a "prevailing party" in civil suits against the United States not sounding in tort is entitled to fees and expenses unless the Government's position was "substantially justified" or "special circumstances make an award unjust." *Id.* § 2412(d)(1)(A). A party prevails when "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992); *see also Cooper v. United States R.R. Retirement Bd.*, 24 F.3d 1414, 1416 (D.C.Cir.1994). Including both the agency's action and the arguments defending that action in court, 28 U.S.C.

§ 2412(d)(2)(D) (1994), the Government's position is substantially justified if it is "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person. That is no different from ... [having] a reasonable basis both in law and fact." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (internal quotation marks and citation omitted). The Government bears the burden of establishing that its position was substantially justified. *Lundin v. Mecham,* 980 F.2d 1450, 1459 (D.C.Cir.1992) (citing *Jones v. Lujan,* 887 F.2d 1096, 1098 (D.C.Cir. 1989)).

Although the district court found that Vollmer was a prevailing party, it rejected Vollmer's claim for fees and expenses, concluding that the Bureau's denial of the company's second application had been substantially justified. Vollmer now appeals.

## II

■ Both parties agree that Vollmer is a "prevailing party" under the Equal Access to Justice Act. Both parties also agree, as do we, that the district court properly found that this court's previous rejection of the Bureau's interpretation of the Firearms Act does not settle the question we face today: whether the Government's position was substantially justified within the meaning of the Equal Access Act. The inquiry into the reasonableness of the Government's position under the Equal Access Act "may not be collapsed into our antecedent evaluation of the merits, for the EAJA sets forth a 'distinct legal standard.'" *Cooper,* 24 F.3d at 1416 (quoting *FEC v. Rose,* 806 F.2d 1081, 1089 (D.C.Cir.1986)).

■ Although the substantial justification inquiry differs from the merits determination, the court's merits reasoning may be quite relevant to the resolution of the substantial justification question. In some cases, the standard of review on the merits is so close to the reasonableness standard applicable to determining substantial justification that a losing agency is unlikely to be able to show that its position was substantially justified. *See United States v. One Parcel of Real Property,* 960 F.2d 200, 209 (1st

Cir.1992); *see also* Gregory C. Sisk, *The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part Two),* 56 LA. L.REV. 1, 23–42 (1995). Thus we have held that where an agency's decision was overturned as unsupported by substantial evidence, the agency's position was not substantially justified because it "lacked a reasonable factual basis." *Cooper,* 24 F.3d at 1417 (emphasis omitted). In contrast, whether agency action invalidated as arbitrary and capricious might nevertheless have been substantially justified depends on what precisely the court meant by "arbitrary and capricious." For example, a determination that an agency acted arbitrarily and capriciously because it failed to provide an adequate explanation or failed to consider some relevant factor in reaching a decision "may not warrant a finding that [the] agency's action lacked substantial justification." *Wilkett v. ICC,* 844 F.2d 867, 871 (D.C.Cir. 1988) (citing *Rose,* 806 F.2d at 1087–89). However, "a finding that an agency acted arbitrarily and capriciously by denying equal treatment to similarly situated parties"—we would say *clearly* similarly situated—or by failing to enforce a rule where it plainly applied "renders it much more likely that the Government's action was not substantially justified." *Id.* (citing *Rose,* 806 F.2d at 1089). Moreover, because "unreasonable" may have different meanings in different contexts, even the presence of that term or one of its synonyms in the merits decision does not necessarily suggest that the Government will have a difficult time establishing that its position was substantially justified. *See, e.g., United States v. $19,047.00 in United States Currency,* 95 F.3d 248, 251–52 (2d Cir.1996) (explaining why search found unreasonable under Fourth Amendment may be reasonable for Equal Access Act purposes). Likewise, the absence of the word "unreasonable" does not necessarily suggest that the Government's position was substantially justified. The relevance of a court's reasoning on the merits to the reasonableness inquiry under the Equal Access Act thus depends on the nature of the case.

In this case, whether the Bureau's position was substantially justified turns on the reasonableness of the once-a-machinegun-always-a-machinegun reading of the Firearms Act that informed the Bureau's rejection of Vollmer's second application. Whether the Bureau's position was substantially justified, however, is not an issue we review de novo. We limit our inquiry to determining whether the district court abused its discretion in finding the once-a-machinegun-always-a-machinegun interpretation reasonable. *Pierce*, 487 U.S. at 563, 108 S.Ct. at 2549. In the Equal Access Act context, abuse-of-discretion review involves two steps. We first ask whether the district court relied on the proper legal standards. Did it, for example, define substantial justification in terms of reasonableness? Did it recognize that the Government's position includes both the agency's action and the arguments offered in court in defense of that action? Errors in these and other purely legal determinations necessarily constitute abuses of discretion. *See, e.g., Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 402, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990).

If, as in this case, the district court made no errors in setting forth the legal standards under the Equal Access Act, we then proceed to the second step, examining the district court's application of those standards to the facts before it. In some Equal Access Act cases, that determination turns largely on an assessment of the strength of the evidence supporting the Government's stance; in other cases, it may turn on a judgment about the reasonableness of the Government's interpretation of statutes or regulations. Although in either case we give substantial deference to the district court's decision, *Pierce*, 487 U.S. at 560–61, 108 S.Ct. at 2547–48; *see also Cooter & Gell,* 496 U.S. at 403, 110 S.Ct. at 2459 (describing "unitary abuse-of-discretion standard" established by *Pierce*); *Trahan v. Brady,* 907 F.2d 1215, 1217 (D.C.Cir.1990) (applying abuse-of-discretion standard to purely legal substantial-justification determination), our deference does not exempt the district court's substantial justification determination from appellate scrutiny. We will reverse the district court if its decision rests on clearly erroneous factual findings or if it leaves us with " 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' " *De Allende v. Baker,* 891 F.2d 7, 11 n. 7 (1st Cir.1989) (quoting *In re Josephson,* 218 F.2d 174, 182 (1st Cir.1954)); *see also Hanover Potato Products, Inc. v. Shalala,* 989 F.2d 123, 127 (3d Cir.1993) (relying on same definition of abuse of discretion in reviewing Equal Access Act decision).

Applying these standards, we conclude that the district court's decision in this case reflected an error of judgment amounting to an abuse of discretion. Simply repeating arguments made by the Bureau before the merits panel without offering any explanation why those arguments showed the Bureau's position was reasonable, the district court largely failed to grapple with the reasoning underlying this court's merits decision and its conclusion that the Bureau's position was not merely incorrect but unreasonable. While the merits panel did not use the word "unreasonable," it highlighted the fundamental unreasonableness of the Bureau's position by pointing out that the Bureau's approach required treating identical weapons in completely different ways. Although a brand new semiautomatic receiver may legally be possessed and transferred, under the Bureau's interpretation of the Firearms Act, a semiautomatic receiver that has been modified into a machinegun receiver and then restored to its original semiautomatic state may not be possessed or transferred, even though its reconfiguration makes it indistinguishable from a brand new semiautomatic. "[I]ncredible" was the word this court used to describe that result. *F.J. Vollmer Co.,* 23 F.3d at 452.

In support of its argument that its distinction between new and remodified semiautomatic receivers, although rejected by the merits panel, was nevertheless reasonable, the agency points out that the Firearms Act treats machineguns differently from other firearms. The agency is certainly correct that, unlike in the case of other weapons, the

Firearms Act includes machinegun receivers and machinegun conversion kits as machineguns in their own right. 26 U.S.C. § 5845(b) (1994). The agency offers no convincing explanation, however, why this difference should lead to different procedures for removing machineguns as opposed to all other weapons from Firearms Act coverage. According to the agency, for weapons other than machineguns, removal of the features that led to the weapon's classification as a firearm suffices to remove the weapon from the Act's coverage. FIREARMS ENFORCEMENT PROGRAM, ATF Order 3310.4B ¶ 83(e)(2). For machinegun receivers, however, removal of the features causing their classification as machineguns does not remove them from Firearms Act coverage, and thus the Gun Control Act's prohibition. Under the agency's once-a-machinegun-always-a-machinegun policy, only complete destruction can remove machinegun receivers from the Firearms Act's coverage. We can find nothing in the text of the Firearms Act to support this difference in treatment.

Defending its once-a-machinegun-always-a-machinegun policy, the Bureau also argues that Congress expected it to interpret the definition of machineguns as broadly as possible. The Senate report on the 1968 amendment to the Gun Control Act that broadened the definition of machineguns to include receivers and conversion kits, however, does not support the Bureau's argument. The report simply shows that Congress intended to treat machinegun receivers and conversion kits as machineguns in their own right and that the same standards for ready restorability and unserviceableness would apply to machinegun receivers and to complete machineguns. See S.REP. No. 90-1501 at 45-46 (1968). Indeed, we think the Bureau's broad definition of machineguns may actually be inconsistent with Congressional intent. When Congress broadened the definition of machineguns in 1968, as well as when it enacted the prohibition on machinegun possession or transfer in 1986, it left the Firearms Act's definition of semiautomatic rifles unchanged, choosing not to restrict the possession or transfer of any semiautomatics. Not until 1994, acting through a separate amendment to the Gun Control Act, did Con-

gress ban some semiautomatics, i.e., semiautomatic assault rifles. Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, § 110102, 108 Stat. 1796, 1996-98 (1994) (codified at 18 U.S.C. § 922(v)). Because the Bureau's position in this case would have prohibited the transfer of one group of semiautomatics—those whose receivers have been modified into machinegun receivers and then reconfigured to their original state—it arguably would have conflicted with Congress's intention until 1994 to permit the transfer of all semiautomatics, subject, of course, to the Firearms Act's general registration and taxation provisions.

The Bureau argues that the reasonableness of its rejection of Vollmer's second application also finds support in the Firearms Act's coverage of both unserviceable and serviceable firearms. See 26 U.S.C. § 5845(h) (1994). Unserviceable firearms are incapable both of shooting and of being readily restored to firing condition. Id. According to the Bureau, the guns at issue in this case—semiautomatic receivers that had once been converted into machinegun receivers—are actually more similar to serviceable machinegun receivers than are unserviceable receivers because, unlike unserviceable receivers, they can be readily restored to serviceable machinegun receivers. Therefore, the Bureau contends, treating unserviceable machinegun receivers as machineguns—as the Firearms Act does—yet excluding remodified semiautomatic receivers from the definition of machineguns is illogical.

One problem with this argument is that the Bureau did not rely on it in rejecting Vollmer's second application. As its counsel acknowledged at oral argument, the Bureau's decision relied solely on the fact that after May 19, 1986, the receiver had been modified into a machinegun receiver. Although the Bureau did raise this argument before the district court, we do not see how it supports the reasonableness of the government's position. The Firearms Act's provision covering unserviceable firearms applies to all firearms; it does not distinguish between machineguns and other weapons, nor between complete weapons and receivers. 26 U.S.C. § 5845(h). The Bureau's insistence that ma-

chineguns, unlike all other firearms, must be destroyed in order to be removed from the Act's coverage thus cannot rest on the Act's coverage of unserviceable firearms.

Having examined the Bureau's arguments from text, structure, legislative history, and underlying policy, we find no reasonable basis for its once-a-machinegun-always-a-machinegun interpretation of the Firearms Act. Nor are we persuaded by the district court's own explanations of why the Bureau's position was nonetheless substantially justified. Although, as the district court observed, the Bureau had followed its interpretation of the Firearms Act since at least the early 1980s, we do not see how merely applying an unreasonable statutory interpretation for several years can transform it into a reasonable interpretation. Like the Bureau, the district court also found support for the Bureau's interpretation in *United States v. Whalen*, 337 F.Supp. 1012 (S.D.N.Y.1972). But *Whalen* simply notes that the Firearms Act's registration provisions cover unserviceable as well as serviceable firearms and that unserviceable machineguns therefore are machineguns under the Act. *Id.* at 1016–17. *Whalen* does not address the status of receivers of any sort, whether machinegun receivers, semiautomatic receivers, or receivers converted from one form to another.

Finally, the district court pointed out that the enforcement manual the merits panel relied on to demonstrate the inconsistency of the Bureau's stance did not cover machineguns. Yet the first example in the relevant section of the manual concerns the reconfiguration of a semiautomatic that had been converted into a machinegun. FIREARMS ENFORCEMENT PROGRAM, ATF Order 3310.4B ¶ 83(f)(1). According to the manual, removal of the parts that converted the semiautomatic into a machinegun would suffice to remove the weapon from coverage by the Firearms Act's definition of machineguns. Although the example does not address machinegun receivers in particular, we think it undercuts the district court's assertion that the manual does not cover weapons that have been converted into machineguns.

## III

Having determined that the agency's position was not "substantially justified" and that Vollmer is thus entitled to recover fees and expenses, we next address the appropriate amount of reimbursement. This requires that we resolve two questions: Is Vollmer entitled to reimbursement of attorney's fees at an enhanced rate? Is the company entitled to reimbursement for all the hours its attorney spent on the case even though it succeeded in overturning only the Bureau's denial of its second transfer application?

In support of its request for reimbursement at an elevated rate, Vollmer cites the Equal Access Act's provision for higher rates in cases involving "a special factor, such as the limited availability of qualified attorneys for the proceedings involved." 28 U.S.C. § 2412(d)(2)(A)(ii) (1994). Interpreting this clause narrowly, the Supreme Court has held that it refers to "attorneys having some distinctive knowledge or specialized skill." *Pierce*, 487 U.S. at 572, 108 S.Ct. at 2554. As examples, the Court has referred to "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* We have interpreted this to mean that fee enhancement is available only for lawyers whose specialty "requir[es] technical or other education outside the field of American law." *Waterman Steamship Corp. v. Maritime Subsidy Bd.*, 901 F.2d 1119, 1124 (D.C.Cir.1990) (emphasis omitted).

Although Vollmer's attorney performed ably in this case, we think his specialization in firearms law does not require the sort of expertise Congress contemplated when it authorized higher fees in special circumstances. To be sure, lawyers practicing administrative law typically develop expertise in a particular regulated industry, whether energy, communications, railroads, or firearms. But they usually gain this expertise from experience, not from the specialized training justifying fee enhancement. If expertise acquired through practice justified higher reimbursement rates, then all lawyers practicing administrative law in technical fields would be entitled to fee enhancements. Because nothing in the Equal Access Act or

its legislative history, *see* H.R.REP. No. 99–120 (1985), *reprinted in* 1985 U.S.C.C.A.N. 132; H.R.REP. No. 96–1418 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4984, 4993–94, indicates that Congress intended this result, we conclude that Vollmer's attorney is entitled to reimbursement at the regular statutory rate of $75 per hour adjusted for the increase in the cost of living.

Turning to the second issue, we begin by noting that the product of a reasonable hourly rate and the number of hours reasonably expended on the entire case only establishes a base for calculating the amount of reimbursable fees. If the prevailing party achieved less than complete success, we must reduce that base to reflect the degree of success achieved. *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574–75; *Commissioner, INS v. Jean*, 496 U.S. 154, 161, 110 S.Ct. 2316, 2320, 110 L.Ed.2d 134 (1990). As required by the Supreme Court, we assess a party's degree of success by asking two questions: "First, did the [party] fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the [party] achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *see also Goos v. National Ass'n of Realtors*, 997 F.2d 1565, 1568 (D.C.Cir.1993).

Claims are related if they "involve a common core of facts or [are] based on related legal theories." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Under this standard, Vollmer's claims were closely related. The weapon covered by its second application was a modified version of the weapon submitted with its first application. Vollmer's challenges to the denial of both applications rested on similar arguments about the reach of the Firearms Act's inclusion of machinegun receivers within the definition of machineguns.

Proceeding to the second *Hensley* question, we "compute the appropriate fee as a function of degree of success." *George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1537 (D.C.Cir.1992) (citing *Hensley*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40). The Bureau urges us to reduce Vollmer's fee significantly, arguing that the market value of the remodified semiautomatic receivers Vollmer was able to sell was much less than the market value of the receivers it could have sold if the denial of its first application had been overturned. Comparing the prices of the guns Vollmer could have sold if its first transfer application had been approved to those of the weapons it was able to sell, the Bureau claims that Vollmer is entitled to only 19% of the fees requested. Because the Bureau's approach is just the sort of formulaic method disapproved in *Hensley*, 461 U.S. at 435–36 & n. 11, 103 S.Ct. at 1940–41 & n. 11, we would not adopt its reasoning even if we could substantiate the Bureau's claims about firearm prices. If this court had sustained the Bureau's denial of Vollmer's second application, the company would have been unable to sell any of its weapons. But because Vollmer successfully challenged the denial of that application, it was able to sell the weapons, although presumably for less than it might have had it prevailed on the first application. *See* Compl. ¶ 8 (alleging that company modified receivers to machine-gun configuration in order to "enhance the value of the firearms"). Vollmer's attorney thus achieved a significant, though less than complete, victory for his client.

Although we reject the Government's formulaic approach, we do think some reduction is appropriate to account for Vollmer's failure to overturn the denial of its first transfer application. Even in cases where claims are interrelated, courts should proportion fees to the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Had Vollmer's failure to set aside the Bureau's denial of its first application been only a minor defeat, we would most likely approve its full request. But because Vollmer's failure to overturn the denial of its first application reduced the "significance of the overall relief obtained," *id.; cf. Goos v. National Ass'n of Realtors*, 68 F.3d 1380, 1387 & n. 12 (D.C.Cir.1995), *reh'g denied*, 74 F.3d 300, 302 (D.C.Cir.1996), and because Vollmer's attorney no doubt devoted some portion of his time to that claim, we think a

reduction is appropriate. The magistrate judge who reviewed Vollmer's fee petition concluded that reimbursement for 70% of the hours claimed equitably reflects the degree of success achieved by the company, and Vollmer acknowledges as much. Reply Br. at 11. Agreeing with the magistrate judge's assessment, we award Vollmer $29,272.84.

*So ordered.*