Opinion for the Court filed by Circuit Judge EDWARDS.
Dissenting opinion filed by Circuit Judge HENDERSON.
HARRY T. EDWARDS, Circuit Judge.
The Secretary of Agriculture (“Secretary”) appeals the District Court’s award of attorney’s fees and costs to several milk marketing cooperatives under the Equal Access to Justice Act (“EAJA”), 28 U.S.C. § 2412 (2000). The underlying litigation involved a dispute between' the cooperatives and the Secretary over the price of Class III butterfat. The Secretary argues that the District Court erred in concluding that the milk cooperatives were “prevailing parties” under EAJA and in calculating the amount of the award.
The price of raw milk and its component parts is governed by a complex regulatory regime known as the Federal Milk Marketing Orders (“FMMO”). The Secretary administers the FMMO pursuant to authority under the Agricultural Marketing Agreement Act (“AMAA”), 7 U.S.C. § 601 et seq. (2000). Prior to 2000, the price under the FMMO for Class III butterfat (which is used to make hard cheeses) was the same as the price for Class IV butterfat (which is used to make butter and nonfat dry milk). In December of that year, the Secretary promulgated a rule creating a separate price for Class III butterfat. The new price, which was to be announced on February 2, 2001, would have applied retroactively to transactions that had taken place in January 2001. See Select Milk Producers, Inc. v. Veneman, 304 F.Supp.2d 45, 48-49 (D.D.C.2004).
Select Milk Producers, Inc., Continental Dairy Products, Inc., and Elite Milk Producers, Inc. (collectively “Milk Producers”) are milk marketing cooperatives, which would have been subject to an immediate loss of an estimated $5,000,000 if the new price for Class III butterfat had taken effect. Id. at 53. On January 31, 2001, the District Court granted Milk Producers’ motion for a preliminary injunction enjoining the Secretary from imposing a separate price for Class III butterfat. The Government- did not appeal the preliminary injunction or otherwise seek to defend its position. Instead, the Secretary issued a new rule that did not include a separate price for Class III butterfat. The parties then stipulated to dismissal of the case as moot. See id. at 49-50.
On May 30, 2003, Milk Producers moved for an award of attorney’s fees and costs under EAJA, which allows “prevailing parties” to obtain expenses in litigation against the federal government unless the Government’s position is substantially justified. See 28 U.S.C. § 2412(d)(1)(A). The District Court concluded that Milk Producers were “prevailing parties” under EAJA and that the Secretary’s position in seeking to implement the separate price for Class III butterfat was not substantially justified. Therefore, the court held that Milk Producers were entitled to attorney’s fees and costs. See Select Milk, 304 F.Supp.2d at 50-54. The District Court also determined that two of Milk Producers’ attorneys should be compensated for some of their hours at rates above EAJA’s statutory cap, because the attorneys’ expertise in the milk marketing regime was a “special factor” that warranted an enhanced fee under the statute. See id. at 55-57.
On appeal, the Secretary argues, that Milk Producers were not “prevailing parties” under EAJA, and that, even if appel-lees were “prevailing parties,” the District Court’s fee enhancement award was an *942 abuse of discretion. We affirm in part and reverse in part. First, we find that the preliminary injunction at issue in this case was a judgment that resulted in a court-ordered change in the legal relationship between the parties and gave Milk Producers the concrete and irreversible redress that they sought. Given these circumstances, Milk Producers are “prevailing parties” under EAJA. Second, we reverse the District Court’s fee enhancement award. The established law of the circuit makes it clear that legal expertise acquired through practice is not a “special factor” justifying an enhanced fee award under EAJA.
I. Background '
The factual background of this case is recited at length in the District Court’s opinion. See Select Milk Producers, Inc. v. Veneman, 304 F.Supp.2d 45 (D.D.C.2004) (“Select Milk ”). Therefore, there is no need here for a detailed statement of facts. Rather, we will focus on the facts that are relevant to the disposition of this appeal.
The FMMO is a complex regulatory regime governing the price of raw milk and its components. Id. at 48. In order to amend market prices under the FMMO, the Secretary must provide notice and an opportunity for a hearing. See 7 U.S.C. § 608c(3) (2000). Under agency regulations, before conducting a hearing, the Secretary must first issue a Notice of Hearing, which, among other things, delineates the scope of the hearing. See 7 C.F.R. § 900.4(a) (2004). An Administrative Law Judge (“ALJ”) then presides over the hearing, and, following the hearing, the Secretary issues a decision on the proposed amendment. See id. §§ 900.6, 900.13a. To become effective, the amendment must be ratified by a designated number of milk producers. See 7 U.S.C. § 608c(8), (9); 7 C.F.R. § 900.14.
In the Consolidated Appropriations Act of 2000, Pub.L. No. 106-113, 113 Stat. 1501 (1999), Congress directed the Secretary to conduct emergency rulemaking to amend the FMMO. The statute instructed the Secretary to issue amended regulations by December 1, 2000, and implement the resulting formulas for milk pricing by January 1, 2001. See id. Div. B., § 1008(a)(8), 113 Stat. 1536, 1501A-518. In response to this legislation, the Secretary published a Notice of Hearing in the Federal Register in April 2000, listing various proposals to amend the FMMO. See Milk in the Northeast and Other Marketing Areas; Notice of Hearing on Class III and Class IV Milk Pricing Formulas, 65 Fed.Reg. 20,094 (Apr. 14, 2000) (“April Notice”). Prior to the April Notice, the price for Class III butterfat had been the same as the price for Class IV butterfat, and the notice did not propose the creation of a separate price for Class III butterfat. In May 2000, an ALJ presided over a five-day hearing on the proposed amendments. During the hearing, one of the participants sought to raise the possibility of imposing a separate price for Class III butterfat. However, with the agreement of the Secretary’s representative, the ALJ concluded that the issue was beyond the scope of the hearing. See Select Milk, 304 F.Supp.2d at 48.
Thus, it is uncontested that the Secretary never gave notice of the possibility of a separate price for Class III butterfat, and this matter was never pursued as an issue in the hearing before the ALJ. Nonetheless, in December 2000, the Secretary issued a tentative final decision that, inter alia, created a separate price for Class III butterfat. See Milk in the Northeast and Other Marketing Areas; Tentative Decision on Proposed Amendments and Opportunity To File Written Exceptions to Tentative Marketing Agreements .and to Orders, 65 Fed.Reg. 76,832 *943 (Dec. 7, 2000) (“Tentative Decision”). The new Class III butterfat price was scheduled to be announced on February 2, 2001, retroactive to January 1 of that year. See Select Milk, 304 F.Supp.2d at 49. After the Tentative Decision was approved by more than the required number of dairy producers, the Secretary promulgated an interim rule amending the FMMO in order to implement the new prices. See Milk in the Northeast and Other Marketing Areas; Interim Amendment of Orders, 65 Fed.Reg. 82,832 (Dec. 28, 2000) (“December 2000 rule”).
Milk Producers sought a preliminary injunction in District Court to prevent the implementation of the December 2000 rule, arguing that the Secretary had failed to comply with the notice and hearing procedures for amending the FMMO as mandated by the AMAA and agency regulations. On January 31, 2001, the District Court granted Milk Producers the relief they requested, entering a preliminary injunction that enjoined the Secretary from imposing the separate Class III butterfat price. Select Milk Producers, Inc. v. Glickman, No. 01-00060 (D.D.C. Jan. 31, 2001) (“2001 preliminary injunction”), reprinted in Joint Appendix (“J.A.”) 30.
The consequences of the 2001 preliminary injunction were significant. The District Court found that, absent the injunction, “[tjhe retroactive nature of the [Secretary’s] price announcement meant that on February 2, 2001, [Milk Producers] would [have been] subject to an immediate loss of an estimated $5,000,000.” Select Milk, 304 F.Supp.2d at 53. This loss would have resulted from transactions between Milk Producers and third parties that were consummated in January 2001. See id. The District Court also found that, had the new Class III butterfat price taken effect, Milk Producers’ loss could not have been recovered. Thus, the trial court held that “a preliminary injunction was the only effective relief [that Milk Producers] could seek.” Id. And in avoiding the substantial monetary loss that they had faced, Milk Producers received irreversible relief by virtue of the preliminary injunction.
The District Court’s order embodying the preliminary injunction was subject to immediate appellate review. The Secretary chose not to appeal, however. Instead of pursuing any further litigation in the matter, the Secretary acceded to the preliminary injunction and conducted a new rulemaking. The Secretary then issued a new regulation that took effect on April 1, 2003, and did not include a separate price for Class III butterfat. See Milk in the Northeast and Other Marketing Areas: Order Amending the Orders, 68 Fed.Reg. 7063 (Feb. 12, 2003). Following issuance of the new rule, the parties stipulated to dismissal of the case as moot. Select Milk Producers, Inc. v. Veneman, No. 01-00060 (D.D.C. Apr. 30, 2003), reprinted in J.A. 86.
On May 20, 2003, Milk Producers moved for an award of attorney’s fees and costs under EAJA, 28 U.S.C. § 2412 (2000). The District Court concluded that the two key requirements for awarding expenses under EAJA were satisfied: (1) Milk Producers were “prevailing parties” under the statute, and (2) the Secretary’s position in promulgating the separate Class III butterfat price was not substantially justified. See Select Milk, 304 F.Supp.2d at 50-54.
In calculating the amount of the award, the District Court compensated most of Milk Producers’ attorneys’ time at the normal statutory maximum rate of $125/hour adjusted upward for cost of living. However, relying on 28 U.S.C. § 2412(d)(2)(A), which allows fee awards at rates beyond the normal statutory cap where a “special factor” exists, the District Court compensated attorney Benjamin Yale at $325/hour *944 and attorney Donald Barnes at $385/hour for one-third of the hours they spent working toward obtaining the preliminary injunction. The District Court concluded that these hours met the “special factor” exception, because Yale and Barnes had special expertise in the federal milk marketing regime and that, with regard to one-third of the hours the attorneys spent working toward the preliminary injunction, their specialized skills were necessary to advance the litigation. See Select Milk, 304 F.Supp.2d at 55-57. In reaching this conclusion, the District Court rested solely on findings that Yale and Barnes had acquired expertise in the complex milk marketing regime through years of practice. See id. at 57. In total, the District Court awarded Milk Producers $101,266.83— comprising $98,381.22 in attorney’s fees and $2,885.61 in costs. Id. at 60.
On appeal, the Secretary does not contest the District Court’s conclusion that the separate price for Class III butterfat was not substantially justified. Instead, the Secretary argues that the District Court misconstrued EAJA when it concluded that Milk Producers were “prevailing parties.” The Secretary also contends that, even if Milk Producers were prevailing parties, the District Court erred in awarding enhanced fees to attorneys Yale and Barnes.
II. Analysis
A. The “Prevailing Party” Requirement of EAJA
EAJA provides, in'relevant part, that a court shall award to a prevailing party other than the .United States fees and other expenses ... incurred by that party in any civil action ... including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
28 U.S.C. § 2412(d)(1)(A). The Secretary claims that the District Court committed legal error in holding that Milk Producers satisfied EAJA’s “prevailing party” requirement. We review thid claim de novo. See Truckers United for Safety v. Mead, 329 F.3d 891, 894 (D.C.Cir.2003); Thomas v. Nat’l Sci. Found., 330 F.3d 486, 491 (D.C.Cir.2003) (“Thomas ”).
1. Defining ‘Prevailing Parties” Under EAJA
The Government’s argument in this case appears to be premised on an assumption that, under the Supreme Court’s decision in Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (“Buckhannon”), and this court’s subsequent decision in Thomas, a preliminary injunction can never transform a party in whose favor the injunction is issued into a “prevailing party” under EAJA. See Appellant’s Br. at 10. Indeed, in arguing that “[Milk Producers] received only a preliminary injunction, but no ‘enforceable judgment on the merits’ or ‘court-ordered consent decree,’ ” id. at 14 (emphasis added), the Government comes close to suggesting that we should adopt a per se rule that a preliminary injunction can never support a claim for fees under EAJA. We reject this view, because it rests on faulty constructions of EAJA, Buckhannon, and Thomas.
EAJA is one of a number of federal statutes that allows courts to award attorney’s fees and costs to the “prevailing party.” In Buckhannon, the Supreme Court considered whether the term “prevailing party” in federal fee-shifting statutes “includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result be *945 cause the lawsuit brought about a voluntary change in the defendant’s conduct.” Buckhannon, 532 U.S. at 600, 121 S.Ct. 1835. Prior to Buckhannon, most courts of appeals had recognized the “catalyst theory,” pursuant to which such a voluntary change in the defendant’s conduct was sufficient to render the plaintiff a “prevailing party.” Id. at 601-02 & n. 3, 121 S.Ct. 1835 (citing cases). Buckhannon rejected this approach and explained that a “ ‘prevailing party’ is one who has been awarded some relief by the court.” Id. at 603, 121 S.Ct. 1835. The Court thus held that the “catalyst theory” improperly “allows an award when there is no judicially sanctioned change in the legal relationship of the parties.” Id. at 605, 121 S.Ct. 1835. Although the fee-shifting statutes at issue in Buckhannon were provisions of the Fair Housing Amendments Act, 42 U.S.C. § 3613(c)(2), and the Americans with Disabilities Act, 42 U.S.C. § 12205, see id. at 603, 121 S.Ct. 1835, it is now clear that Buckhannon’s, construction of “prevailing party” also applies to fee claims arising under EAJA. See Thomas, 330 F.3d at 492.
Although Buckhannon decisively rejected the “catalyst theory,” the Court clearly did not adopt a rule that plaintiffs could only be deemed “prevailing parties” for fee-shifting purposes if they obtained a final judgment on the merits of a suit. Indeed, as counsel for the Secretary correctly acknowledged at oral argument, see Recording of Oral Argument at 27:51-29:22, the decision in Buckhannon left no doubt that a plaintiff need not obtain a judicial determination on the merits in order to be considered a “prevailing party.” On this point, the Court explained:
In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney’s fees. Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered “chang[e][in] the legal relationship between [the plaintiff] and the defendant.”
Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835 (quoting Tex. State Teachers Ass’n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)) (alterations in original) (additional citations omitted). In short, the holding in Buckhannon embraces the possibility that, under certain circumstances, a preliminary injunction, like a consent decree, may result in a court-ordered change in the legal relationship between the parties that is sufficient to make the plaintiff a “prevailing party” under a fee-shifting statute like EAJA. Therefore, Buckhannon surely does not endorse a per se rule that a preliminary injunction can never transform a party in whose favor the injunction is issued into a “prevailing party” under EAJA.
Likewise, the Government is wrong in suggesting that our decision in Thomas holds that there are no circumstances under which a preliminary injunction can serve as the basis for deeming plaintiffs “prevailing parties” under federal fee-shifting statutes. In Thomas, plaintiffs sued an independent federal agency, the National Science Foundation (“NSF”), over Internet domain registration fees. The District Court entered a preliminary injunction prohibiting NSF from “ ‘crediting, spending, obligating, or using any of the money collected for, placed into, or taken from’ ” a fund that included the registration fees at issue, pending the final adjudication of the case. Thomas, 330 F.3d at 489 (quoting District Court’s preliminary injunction). The District Court also awarded plaintiffs partial summary judgment, determining that the collection of fees was unconstitutional. However, before the District Court entered final judgment or addressed plaintiffs’ claim for relief, Congress passed a law that cured the *946 constitutional violation in the collection of the registration fees, and the District Court granted NSF’s .motion to dismiss the case as moot. See id. at 489-90.
The Thomas plaintiffs then filed a request for expenses under EAJA, and the District Court held that the plaintiffs were “prevailing parties” entitled to fees. Id. at 488. This court reversed, concluding that neither the preliminary injunction nor the partial summary judgment at issue changed the legal relationship between the parties so as to render the plaintiffs “prevailing parties.” Id. at 493. We noted that
the sole effect of the preliminary injunction was to prevent NSF from appropriating any money already collected from the registration assessment .... In short, the preliminary injunction did not change the legal relationship between the parties in a way that afforded [plaintiffs] the relief they sought in their lawsuit.

Id.

Quite clearly, Thomas established no per se rule that a preliminary injunction can never serve as the basis for deeming a plaintiff a “prevailing party” under EAJA. Rather, Thomas held that, in the particular circumstances of that case, plaintiffs could not satisfy the “prevailing party” requirement, because the preliminary injunction at issue had not changed the legal relationship between the parties. Thomas did not suggest that, in a dispute such as the one now before us, where a preliminary injunction effected a substantial change in the legal relationship between the parties and provided plaintiffs with concrete and irreversible relief, plaintiffs could not be considered “prevailing parties.”
We are not alone in the view that Buck-hannon does not reject the possibility that preliminary injunctions may be sufficient in some certain circumstances to render plaintiffs “prevailing parties” under federal fee-shifting statutes. Both the Sixth Circuit and the Ninth Circuit adopted this position in decisions issued after Buckhannon. See Dubuc v. Green Oak Township, 312 F.3d 736, 753-54 & n. 8 (6th Cir.2002) (noting Buckhannon’s rejection of the “catalyst theory,” but explaining that preliminary injunctions can suffice to satisfy the “prevailing party” requirement under certain circumstances); Watson v. County of Riverside, 300 F.3d 1092, 1096 (9th Cir.2002), cert. denied, 538 U.S. 923, 123 S.Ct. 1574, 155 L.Ed.2d 313 (2003) (“A preliminary injunction issued by a judge carries all the ‘judicial imprimatur’ necessary to satisfy Buckhannon.”). But see Smyth v. Rivero, 282 F.3d 268, 276-77 & n. 9 (4th Cir.2002) (apparently adopting a per se rule). We think it is clear that neither Buckhannon nor Thomas endorse a per se rule that a preliminary injunction can never transform a party in whose favor the injunction is issued into a “prevailing party” under EAJA. Such a position simply does not follow logically from the Court’s indication in Buckhannon that a plaintiff need not obtain a final judicial determination on the merits in order to be considered a “prevailing party.” See Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835.
2. Applying Buckhannon and Thomas to the Facts of this Case
Our decision in Thomas relies on Buck-hannon to develop a framework for determining whether plaintiffs are “prevailing parties.” Applying the Thomas framework to the facts of this case, we conclude that Milk Producers were “prevailing parties” under EAJA.
In Thomas, we explained that Buckhan-non embraces three core principles for construing the term “prevailing party” in federal fee-shifting statutes:
*947 First, in order to be a prevailing party, a claimant must show that there has been a court-ordered change in the legal relationship between the plaintiff and the defendant. (Citing Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835.)
Second, a prevailing party is a party in whose favor a judgment is rendered, regardless of the amount of damages awarded. (Citing Buckhannon, 532 U.S. at 603, 121 S.Ct. 1835.)
Third, a claimant is not a prevailing party merely by virtue of having acquired a judicial pronouncement unaccompanied by judicial relief. (Citing Buckhannon, 532 U.S. at 606, 121 S.Ct. 1835.)
See Thomas, 330 F.3d at 492-93 (discussing these factors).
In this case, plaintiffs satisfy all three Thomas factors. First, there was a court-ordered change in the legal relationship between Milk Producers and the Secretary. The trial court’s preliminary injunction blocked enforcement of the new regulation that had been promulgated by the Secretary in December 2000. As a result, Milk Producers were never required to operate under a market regime with a separate price for Class III butterfat. In addition, the court-ordered relief secured by Milk Producers was concrete and irreversible as of February 2, 2001. The District Court stated that, because the 2001 preliminary injunction vitiated the December 2000 rule, Milk Producers saved an estimated $5,000,000 that they would have otherwise been forced to pay when the new price for Class III butterfat took effect on February 2, 2001, retroactive to January 1, 2001. See Select Milk, 304 F.Supp.2d at 53 (citing Milk Producers’ motion for preliminary injunction).
Neither the Secretary’s briefs nor oral argument to this court purported to contradict the District Court’s conclusion that, as a direct result of the 2001 preliminary injunction, Milk Producers saved a substantial sum of money. See Recording of Oral Argument at 2:37-3:57. The Secretary’s counsel also conceded that any money Milk Producers saved was permanent. See id. at 4:00-:09. Therefore, like the benefit plaintiffs receive through court-approved consent decrees, the relief that Milk Producers received in this case was “the product of, and bears the sanction of, judicial action in the lawsuit.” Buckhannon, 532 U.S. at 618, 121 S.Ct. 1835 (Scalia, J., concurring).
This case is similar to situations in which we have found that the subsequent mootness of a case does not necessarily alter the plaintiffs’ status as prevailing parties. See, e.g., Nat’l Black Police Ass’n v. D.C. Bd. of Elections, 168 F.3d 525, 528 (D.C.Cir.1999); Grano v. Barry, 783 F.2d 1104, 1108-09 (D.C.Cir.1986). As we noted in Thomas,
[t]he specific relief granted in [Nat’l Black Police Ass’n and Grano ] was concrete and could not be reversed despite a subsequent finding of mootness. In Grano, for example, plaintiffs sought and won an injunction to delay the demolition of a historical site until a public referendum was held. 783 F.2d at 1108. That reprieve was unchanged when the case was later declared moot, because the referendum in question had already occurred. The injunction produced a lasting change in the parties’ legal circumstances and gave the plaintiffs the precise relief that they had sought.
Thomas, 330 F.3d at 493. The plaintiffs in Thomas differed from those in Nat’l Black Police Ass’n and Grano and were found not to be “prevailing parties,” because the Thomas plaintiffs “filed a lawsuit in order to obtain a refund from [the National Science Foundation], but the preliminary injunction did nothing to vindicate that claim.” Id. Here, however, just as was the *948 case for the plaintiffs in Grano, Milk Producers’ claim was fully vindicated by the court-ordered change .in the parties’ relationship. And as Thomas noted in its discussion of Nat’l Black Police Ass’n and Grano, it does not matter that this case became moot . after the court-ordered change in the parties’ relationship. Thomas, 330 F.3d at 493.
Nat’l Black Police Ass’n and Grano differ from this case in that the plaintiffs in those cases received final judgments on the merits of their claims, whereas the plaintiffs here secured relief through a preliminary injunction. Nonetheless, it is noteworthy here that, in awarding a preliminary injunction to Milk Producers, the District Court found that
plaintiffs were likely to succeed on the merits of their claims [because] “the Secretary ... clearly did not give fair notice to the industry.”
Select Milk, 304 F.Supp.2d at 49 (quoting hearing on the 2001 preliminary injunction). Just as the Government did not appeal from the District Court’s holding that the Secretary’s position in imposing the separate Class III butterfat price was not substantially justified, neither does the Government take issue with the District Court’s finding that Milk Producers undoubtedly would have succeeded on the merits. In other words, this is not a case in which a preliminary injunction was based less on the trial court’s view of the merits than on a perceived hardship to the plaintiff. See Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C.Cir.1998) (discussing the four factors that a court must balance on a sliding scale in considering a request for a preliminary injunction). Rather, Milk Producers secured a preliminary injunction in this case largely because their likelihood of success on the merits was never seriously in doubt.
The dissent disagrees with our holding that the 2001 preliminary-injunction resulted in a court-ordered change in the legal relationship between Milk Producers and the Secretary, because, according to the dissent, in this case the preliminary injunction did “nothing more than preserv[e] the status quo.” But, as we explained above, the 2001 preliminary injunction provided concrete and irreversible judicial relief to Milk Producers based on the District Court’s conclusion that Milk Producers were likely to prevail on the merits. In these circumstances, the dissent’s argument that the 2001 preliminary injunction did not alter the status quo — based on its formalistic resort to the definition of the status quo as “the last peaceable uncontested status existing between the parties before the dispute developed” — is beside the point. Whatever semantic spin one wishes to put on it, the 2001 preliminary injunction resulted in an irreversible and substantial monetary savings to Milk Producers based on the District Court’s assessment of the merits of Milk Producers’ claim. Clearly, then, the 2001 preliminary injunction was a court-ordered change in the legal relationship between the parties.
Having concluded that the 2001 preliminary injunction was a court-ordered change in the legal relationship between Milk Producers and the Secretary, as required by the first Thomas factor, we turn to consider the second and third Thomas factors. We hold that they too were satisfied in this case.
The 2001 preliminary injunction was a judgment rendered in favor of Milk Producers, thus meeting the second Thomas factor. The term “judgment” includes “a decree and any order from which an appeal lies.” Black’s Law DiotionarY 846 (7th ed.1999) (citing Fed. R. Civ. P. 54). And it is well established that preliminary injunctions are appealable orders under 28 U.S.C. § 1292(a)(1). See, e.g., El Paso Natural Gas Co. v. Neztsosie, 526 U.S. *949 473, 482, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999). Nothing in Thomas indicates that we meant to depart from the ordinary definition of “judgment” in determining whether plaintiffs have satisfied the second part of the “prevailing party” framework. See Thomas, 330 F.3d at 493. The 2001 preliminary injunction meets the legal definition of a judgment, and there is no dispute that it was rendered in Milk Producers’ favor. Therefore, Milk Producers have satisfied the second Thomas factor.
Finally, the 2001 preliminary injunction surely provided Milk Producers with “judicial relief,” as required by the third Thomas factor. The same edition of Black’s Law Dictionary that the Supreme Court cited in Buckhannon, 532 U.S. at 603, 121 S.Ct. 1835, defines relief as “redress or benefit, esp. equitable in nature (such as an injunction or specific performance) that a party asks of a court.” Black’s Law Dictionary, supra at 1293 (emphasis added). In this case, Milk Producers asked the District Court for equitable relief in the form of a preliminary injunction that would enjoin the implementation of the December 200Ó rule before the separate price for Class III butterfat took retroactive effect. When the District Court issued the injunction, it granted Milk Producers the precise relief that they had requested. This satisfied the third Thomas factor.
In holding that Milk Producers were “prevailing parties” under EAJA, we note that this is not a case in which the Government voluntarily changed its ways before judicial action was taken. If the Government had acted to moot this case through voluntary cessation before there was a judicially sanctioned change in the legal relationship of the parties, Milk Producers would not have been “prevailing parties.” This would be so, because, as the Court noted in Buckhannon, a defendant’s “voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial' imprimatur on the change. Our precedents thus counsel against holding that the term ‘prevailing party’ authorizes an award of attorney’s fees ivithout a corresponding alteration in the legal relationship of the parties.” 532 U.S. at 605, 121 S.Ct. 1835. However, the record in this case demonstrates that the District Court’s injunction, not the Secretary’s voluntary change in conduct, afforded Milk Producers the relief they sought—a savings of an estimated $5,000,000 and an order barring the Secretary from enforcing the new rule imposing a separate price for Class III butterfat.
We also note that our decision comports with the well-recognized principle that, normally, when a losing party is blocked from appealing an adverse judgment or order because the case becomes moot due to happenstance, the court will vacate the disputed judgment or order. See U.S. Bancorp Mortgage Co. v. Bonner Mall P’ship, 513 U.S. 18, 115 S.Ct. 386; 130 L.Ed.2d 233 (1994) (“Bancorp ”). “A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment.” Id. at 25, 115 S.Ct. 386. In applying this principle, however, the Supreme Court has made it clear that .“[t]he principal condition to which [a court should look] is whether the party seeking relief from the judgment below caused the mootness by voluntary action.” Id. at 24, 115 S.Ct. 386. See. also N. Cal. Power Agency v. Nuclear Regulatory Comm’n, 393 F.3d 223, 225 (D.C.Cir.2004) (construing Bancorp to mean that “vacatur in moot cases should be determined by considerations of ‘fairness’ and ‘justice’ ”). Thus, “vacatur is usually inappropriate when ‘the party seeking relief from the judgment below *950 caused the mootness by voluntary action.’ ” Nat’l Black Police Ass’n v. District of Columbia, 108 F.3d 346, 351 (D.C.Cir.1997) (quoting Bancorp, 513 U.S. at 24, 115 S.Ct. 386); N. Cal. Power Agency, 393 F.3d at 225. Indeed, the Supreme Court has made it clear that even “[w]here mootness results from settlement, ... the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur.” Bancorp, 513 U.S. at 25, 115 S.Ct. 386. Just as it is not unfair to deny the remedy of vacatur to a party whose voluntary action moots a case, it is not somehow unfair here to conclude that Milk Producers were “prevailing parties” when the Government voluntarily forfeited its right to appeal the injunction and voluntarily elected to moot the case after judicial action was taken against the Government.
In sum, we hold that the District Court correctly concluded that Milk Producers were “prevailing parties” under EAJA. The Secretary has not contested the District Court’s finding that the Secretary’s position in creating a separate price for Class III butterfat was not substantially justified. Therefore, we affirm the District Court’s decision that Milk Producers are entitled to attorney’s fees and costs. We now turn to the question as to whether the District Court properly granted an enhancement in the hourly fees awarded to two of Milk Producers’ attorneys.
B. The Fee Enhancement
EAJA provides that “attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.” 28 U.S.C. § 2412 (d) (2) (A) (ii). Here, the District Court concluded that a “special factor” justified an enhancement in the hourly rates awarded to attorneys Yale and Barnes for one-third of the time they spent working toward obtaining the preliminary injunction. We review the District Court’s enhancement award for abuse of discretion. See Pierce v. Underwood, 487 U.S. 552, 571, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). We conclude that the District Court abused its discretion in awarding the enhanced fee, because Milk Producers failed to establish that either Yale or Barnes had “‘some distinctive knowledge or specialized skill needful for the litigation in question.’ ” Truckers United, 329 F.3d at 894 (quoting Underwood, 487 U.S. at 572, 108 S.Ct. 2541).
In Underwood, the Supreme Court explained that the reference to the “limited availability of qualified attorneys” in § 2412(d)(2)(A)(ii) “must refer to attorneys ‘qualified for the proceedings’ in some specialized sense, rather than just in their general legal competence.” Underwood, 487 U.S. at 572, 108 S.Ct. 2541. To qualify for compensation at enhanced hourly rates under this standard, an attorney must possess “some distinctive knowledge or specialized skill needful for the litigation in question,” which can include “an identifiable practice specialty such as patent law, or knowledge of foreign law or language.” Id. The Court further explained that “the other ‘special factors’ envisioned by the exception [to EAJA’s normal maximum hourly rate] must be such as are not of broad and general application.” Id. at 573, 108 S.Ct. 2541. The difficulty or undesirability of the case, the work and ability of counsel, and the results obtained do not qualify as “special factors” under the statute. Id.
Applying Underwood, we have made clear that an attorney cannot be awarded enhanced fees under the “special factor” exception based solely on expertise the lawyer acquired through practice in a spe *951 cific area of administrative law. As we stated in F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 598 (D.C.Cir.1996), while “lawyers practicing administrative law typically develop expertise in a particular regulated industry, whether energy, communications, railroads, or firearms ... they usually gain this expertise from experience, not from the specialized training justifying fee enhancement.” Emphasizing that nothing in the text or legislative history of EAJA suggests that Congress intended to make “all lawyers practicing administrative law in technical fields” eligible for a fee enhancement, we concluded that “expertise acquired through practice” was not a “special factor” that could warrant an enhanced fee. Id. at 598-99.
In this case, the District Court found that attorneys Yale and Barnes had “specialized knowledge” of the “extremely complex” federal milk marketing regime. Select Milk, 304 F.Supp.2d at 55-56. The District Court further found that this specialized knowledge was “needful for the litigation in question” with respect to one-third of the hours that Yale and Barnes spent working toward obtaining the preliminary injunction. The court thus held that Yale and Barnes were entitled to compensation at enhanced rates for those hours. Id. at 57. The fundamental flaw in this analysis is that the justification the District Court offered for concluding that Yale and Barnes had “specialized knowledge” was the expertise the attorneys had acquired through practice. See id. at 57 (“Attorney Yale specializes in the representation of dairy farms and dairy cooperatives .... Attorney Barnes has spent over three decades representing dairy cooperatives on issues relating to the AMAA.”). As explained above, under the clear precedent of this circuit, such expertise acquired through practice in a particular field of administrative law is insufficient to justify an enhanced fee award under the “special factor” exception to EAJA’s normal cap on attorney’s fees. See F.J. Vollmer, 102 F.3d at 598.
The District Court did also note that Yale “worked in the dairy'industry prior to becoming an attorney.” Select Milk, 304 F.Supp.2d at 57. But the District Court merely mentioned this fact, failing to explain how any knowledge that Yale acquired from his previous work in the dairy industry was needful for the litigation in question — a precondition for a court to find that a “special factor” exists warranting fee enhancement under EAJA. See Truckers United, 329 F.3d at 896. Because the only relevant expertise identified by the District Court was expertise Yale and Barnes acquired through years of practice in a field of administrative law, there was no justification for an enhanced fee award under EAJA. The District Court’s contrary conclusion was an abuse of discretion. See id. at 894.
III. Conclusion
The District Court’s judgment is affirmed in part and reversed in part. For the reasons stated above, we affirm the District Court’s conclusion that Milk Producers were “prevailing parties” entitled to attorney’s fees and costs under EAJA. However, we reverse the District Court’s determination that attorneys Yale and Barnes were entitled to enhanced fees for one-third of the hours they worked toward obtaining the 2001 preliminary injunction. The case will be remanded to the District Court so that it can adjust the attorney’s fees award as required by this decision.

So ordered.